**WALLING, Administrator of Wage and Hour Div., U. S. Dept. of Labor, v. JACKSONVILLE PAPER CO. et al.**

Civil Action No. 209–J.

District Court, S. D. Florida, Jacksonville Division.

Jan. 23, 1947.

George A. Downing, Regional Atty., of Atlanta, Ga., James H. Shelton, Sr. Atty., of Atlanta, Ga., for plaintiff.

Louis Kurz and Ragland, Kurz & Layton, all of Jacksonville, Fla., for defendants.

De VANE, District Judge.

This case is again before the Court on an application of the Administrator of the Wage and Hour Division of the United States Department of Labor, filed April 16, 1946, seeking an adjudication in civil contempt of the defendants based on alleged violations of the terms of the Judgment of this Court entered August 29, 1941, and of the Amended and Modified Judgment entered June 3, 1943.

On July 8, 1940, petitioner's predecessor filed a complaint against all the above named defendants seeking an injunction under Section 17 of the Fair Labor Stand-

ards Act, 29 U.S.C.A. §§ 201 et seq., 217, against alleged violations of said Act. After trial the Court, on August 29, 1941, entered a final judgment against the co-partner defendants doing business as Southern Industries and against the Jacksonville Paper Company as to its operations in its main office and warehouse in Jacksonville and against the following branches: Jacksonville Paper Company, Jacksonville; Capitol Paper Company, Tallahassee; Pensacola Paper Company, Pensacola; Partin Paper Company, Mobile, Alabama; and against the Atlantic Paper Company, Savannah, Georgia. The Court held that employees of the Jacksonville Paper Company at the following branches were not subject to the terms and provisions of the Wage and Hour law, to-wit: Tampa Paper Company, Tampa; Lakeland Paper Company, Lakeland; Central Paper Company, Orlando; East Coast Paper Company, West Palm Beach; Everglades Paper Company, Miami; Pinellas Paper Company, St. Petersburg, all in the State of Florida, and Macon Paper Company, Macon, Georgia.

Both sides appealed and the Circuit Court of Appeals in Fleming, Administrator, v. Jacksonville Paper Company et al., and visa versa, 5 Cir., 128 F.2d 395, reversed the lower court primarily on the ground that the judgment and injunctive order went beyond the relief sought by plaintiff and directed that a new judgment and injunctive order be entered restricting the injunction to prohibition of violations alleged in the complaint. The Circuit Court of Appeals held that the duties of each particular employee would govern the coverage, but held against the contention of the Administrator that all employees of all branches were within the Act because the merchandise handled by them, to a large extent, came from outside the State. Certiorari was granted by the Supreme Court of the United States and in Walling, Administrator, v. Jacksonville Paper Company, 317 U.S. 564, 63 S.Ct. 332, 335, 87 L.Ed. 460, the Supreme Court modified and as modified affirmed the judgment of the Circuit Court of Appeals.

The Supreme Court held that that part of the decision of the Circuit Court of Appeals, which held that "any pause at the warehouse is sufficient to deprive the remainder of the journey of its interstate status" was too restrictive. The Supreme Court held that a temporary pause at the warehouse does not mean that goods are no longer "in commerce," within the meaning of the Act; if the halt in the movement of the goods is a convenient and natural step in the process of getting them to their final destination they remain in commerce until they reach those points. The Court held, however, that the Administrator had not sustained the burden which was on him to show that the goods continued in commerce where they passed through defendant's warehouse. This question was left for decision by the District Court after further evidence thereon.

Following the decision of the Supreme Court, the lower Court, without further hearing, entered an amended and modified judgment pursuant to the mandate of the Supreme Court, enjoining the defendant from violating the specific provisions of the Wage and Hour Act, with which they had been charged in the complaint and which the Circuit Court of Appeals and the Supreme Court had determined they were violating.

None of the practices now complained of and for which plaintiff asks the Court to adjudge the defendants in civil contempt were specifically enjoined by the judgment of August 29, 1941, or by the judgment of June 3, 1943, although most of the practices were in existence at the time these orders were entered. The reason for this grew out of the fact that the first trial of this case centered around the controversy as to what extent the defendants were subject to the Act. Nothing further was decided in the first trial of this case and that question was not fully decided.

The questions the Court now has before it may be summarized as follows:

1. Are the employees of the Jacksonville Paper Company, at its branches in Tampa, Orlando, St. Petersburg, Lakeland and West Palm Beach, Florida, engaged in work in Interstate Commerce, within the meaning of the Act? Plaintiff offered

no proof of violations at three of the branches, viz., Miami and Daytona Beach, Florida, and Macon, Georgia.

2. Is the so-called Accumulated-Hours Plan in violation of the Act?

3. Does the Bonus Plan result in failure to pay required overtime?

4. Were certain employees misclassified as "executive" and "administrative" employees?

5. Did the defendants violate Section 7 of the Act by payment of straight piece rates to piece workers who worked in excess of forty hours per week?

6. Did the defendant violate Sections 6 and 7 of the Act in failing to compensate their employees for hours worked, which were not registered by the time clock?

7. Have the defendants violated the record keeping and shipping provisions of the Act?

These questions will be considered in the order stated. A proper exploration of the facts relating to each question will make this Memorandum Opinion tedious and long.

1. Are the Employees of Jacksonville Paper Company at Its Branches at Tampa, Orlando, St. Petersburg, Lakeland and West Palm Beach, Florida, Engaged in Work in Interstate Commerce, Within the Meaning of the Act?

Jacksonville Paper Company is engaged in the wholesale distribution of a large variety of paper, paper products and related articles. Its home office and warehouse are maintained in Jacksonville, Florida, and the company also maintains thirteen branches. As stated above, the employees at the home office and five of the branches were found, at the original trial of this case, to be subject to the Act. The Court now has before it the question as to whether the employees at the above named branches are also subject to the Act.

Approximately three-fourths to four-fifths of the goods which Jacksonville Paper Company distributes are supplied by manufacturers located in States other than the State of Florida, the remainder being supplied by Southern Industries, the co-partnership defendants herein. The branches we are here considering make no sales across State lines. Employees at these branches are subject to the Act only if goods received at the branches from points outside the State of Florida and sold within the State being then under the Act.

The factual situation surrounding defendant's business and its methods of operating changed substantially during the War which recently ended. Wartime restrictions made it necessary for defendant to allocate to each of its customers a proportionate share of practically all goods purchased by it. This allocation of goods between customers clearly put the merchandise "in commerce" within the meaning of the Act, at all its branches as that term is construed by the decision of the Supreme Court in Walling v. Jacksonville Paper Company, supra. However, the War is now ended. Wartime restrictions have been largely removed and this case should not and will not be decided on the basis of wartime conditions.

Disregarding that part of the evidence touching the effect of the War upon defendant's operations, other evidence undeniably shows that the branches here in question are engaged in Interstate Commerce in certain particulars. The evidence shows that these branches handle and distribute prior order goods, special order goods and drop shipments. They sell citrus, cigar and other labels which are intended for and actually move in shipments of citrus, cigars and other products to out-of-State points. They sell newsprint to newspaper companies with circulations outside the State. Also numerous items are ordered for specific customers with their names, etc., printed upon the merchandise. This class of business is all "in commerce" and the Supreme Court so held in Walling v. Jacksonville Paper Company, supra.

The Opinion of this Court, therefore, as to whether defendant is engaged in Interstate Commerce at the branches here in question will be based upon broader grounds. As pointed out above, approximately three-fourths to four-fifths of

all goods sold customers come from outside the State of Florida. The company has an established business with salesmen at each branch and orders are placed for each branch to meet the demands of customers served by the branch as such customers' demands are disclosed by prior orders and purchases. It is impossible for the Court to determine from the evidence precisely what goods shipped in interstate commerce to the branches are purchased to fill contracts or anticipated needs of specific customers and what goods are intended for warehouse purposes to meet demands of unknown customers at the time the goods are ordered. But the evidence leaves no doubt in the mind of the Court that by far the larger part of all goods received at the branches is ordered to fill contracts and anticipated needs of specific customers. And it is the opinion of the Court that the evidence introduced at the prior trial in this case, plus the evidence offered at this trial is sufficient to establish such practical continuity in Interstate Commerce between the movement of the goods to the branches and from the branches to regular customers to keep the movement "in commerce" within the meaning of the Act. Any halt at the warehouse in the movement of the goods purchased to fill orders of customers is merely an intermediate step in the process of getting such goods to customers.

The company makes no segregation of its employees as between interstate and intrastate commerce activities. The record shows that all of its employees participate in the foregoing activities sufficient to bring those that are covered by the Act within its terms. Since defendant uses its employees indiscriminately in both classes of business and since defendant is engaged in Interstate Commerce at all the above named branches it is not necessary for the Court to do more at this time than determine that a substantial part of the work of all employees at said branches is in interstate commerce and the Court so determines and holds.

2. The Accumulated-Hours Plan.

On or about April 29, 1940, defendant inaugurated a so-called Accumulated-Hours Plan as to many of its employees who had formerly been paid flat weekly salaries without additional compensation for overtime hours. The change was accomplished through a wholesale firing of all employees on Saturday, April 27, 1940, and a wholesale re-hiring of these same employees on Monday, April 29, 1940. Under the Accumulated-Hours Plan employees generally continued to receive the same amount of weekly compensation as before, with minor changes necessitated by arithmetical limitations and they continued to work the same number of hours as formerly.

In order to put the plan into effect the employees were required to sign a contract of employment. This contract was in blank form and contained a space in which the straight time and overtime hourly rate of pay was stated. Some of the employees testified that the contract had been filled out before they signed it, while others testified this was not the case with them. The desired results were accomplished by setting up for each employee a purported hourly rate which was arrived at by dividing into the regular and agreed weekly salary a number of hours for which the employee was purportedly employed which was, in every case, greater than the number customarily and regularly worked. Defendant then computed and entered on its payroll records compensation at the alleged hourly rate for the straight time hours and an additional one-half time for hours between forty and the number specified in the contract. The female employees normally worked a schedule of forty-eight hours, both before and after the Accumulated-Hours Plan went into effect. Their hourly rates, in most cases, were computed on an assumed schedule of forty-nine and one-half hours and were figured so that the agreed salary covered both straight time and overtime for forty-nine and one-half hours. In later contracts an assumed schedule of fifty-five hours was used for some of the women employees. The male employees normally worked a weekly schedule of fifty hours. The hourly rates were figured and the contracts and payroll records were set up for an assumed fifty-four hour schedule. Later the rates were calculated on the basis of

fifty-five hours, in some cases, and sixty hours in others.

On August 1, 1940, the Plan was amended to include a purported account with each employee to which there were posted weekly the difference between the hours the employee actually worked and the number for which the employee had been purportedly hired. The effect of the Amendment was to make it unnecessary for the company to pay any overtime compensation for any additional overtime hours worked beyond those agreed to be worked at the time the employee was hired, except in a few instances not important here. The Plan, as operated, left the employees indebted to the company for many unworked hours, but the record shows the company never called upon any of its employees to make good on that part of their contract beyond failing to compensate them for the time worked beyond the schedule agreed upon.

At the time the- Accumulated-Hours Plan was put into effect, it was believed by defendant to fully comply with the decision of the Supreme Court of the United States in Walling v. A. H. Belo Corporation, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716. The Amendment to the Plan, adopted August 1, 1940, was an effort to take advantage of the pre-payment plan theretofore promulgated by the Administrator of the Wage and Hour Division.

Counsel for plaintiff contends that the Supreme Court has overruled its holding in Walling v. A. H. Belo Corporation, supra, by its later decisions in Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29; Walling v. Youngerman-Reynolds Hardwood Co., Inc., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705; and Walling v. Harnischfeger Corporation, 325 U.S. 427, 65 S.Ct. 1246, 89 L.Ed. 1711. Counsel for plaintiff further contends that the decision of the Supreme Court in the Belo case has no application to this case.

The Circuit Courts of Appeals for the Second and Seventh Circuits, in Walling v. Uhlmann Grain Co. et al., 151 F.2d 381, and Walling v. Richmond Screw Anchor Co., Inc., 154 F.2d 780, lend support to the contention of counsel for plaintiff that the Supreme Court has so modified its holding in the Belo case that the latter case is no longer the law.

This Court does not agree with the contention of counsel for plaintiff that the Supreme Court has completely nullified its decision in the Belo case. The Accumulated-Hours Plan here under consideration, however, is in no respect like the plan approved by the Supreme Court in the Belo case and the decision in that case has no controlling effect here. The testimony in this case shows that defendant hired its employees for a stipulated weekly salary for which the employees agreed to work a certain number of hours weekly. The wholesale firing and re-hiring of the employees affected, without any substantial change in compensation or in hours actually worked, and the setting up of a completely false and fictitious method of computing compensation without regard to the hours actually worked, renders the plan and contracts between defendant and its employees, illegal. The vice of the plan lies in the fact that the contracts do not represent the rates paid for non-overtime and overtime hours actually worked.

The plan and the contracts being illegal under the Act, the weekly salaries agreed upon before the contracts were executed and the plan put into effect constitute the basis for determining the regular and overtime rates. In similar cases the Supreme Court has held that the weekly salary agreed upon, divided by the hours agreed to be worked in each week, equals the regular rate; one and one-half times that rate equals the overtime rate for hours worked in excess of the forty. See Walling v. Helmerich & Payne, Inc., supra, and Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682.

The Court holds the Accumulated-Hours Plan as adopted and put into effect by defendant, is in violation of Sections 6 & 7 of the Wage and Hour Act.

### 3. The Bonus Plan.

On June 1, 1942, defendant put into effect a so-called Bonus Plan, which was still in effect without change when the case was heard. At the end of each fiscal year

(May 31st) the company, by corporate resolution, declares from the previous year's surplus, a bonus to employees. The bonus is paid all employees except Managers working on a split profit basis and salesmen working on commissions. The bonus is a fixed percentage of the employee's previous year or partial year's total compensation, being payable in twelve equal monthly instalments.

The schedule of bonus percentages is as follows:

Continuous employment for 8 years
   or more ...................... 25%
Continuous employment for 5 to 8
   years ........................ 22½%
Continuous employment 1 to 5 years 20%
Employment for less than 1 year... 15%

Defendant issues notices to the employees yearly giving them formal notice of the declaration of the bonuses. The Board of Directors contemporaneously with the declaration of the bonus authorizes the execution of a promissory note, payable to each employee entitled to a bonus, for the full amount of the bonus due him. The notice to employees states that the company will hold the notes "as a matter of convenience" and the employees apparently never see them. The bonus is paid monthly and defendant credits on the back of each note the monthly instalments as paid. The notes, themselves, bear a stamped statement to the effect they will be cancelled if the employee's connection with the company is terminated any time during the year and the testimony is to the effect that the note, in each case, is cancelled without further payment to the employee.

The evidence shows that the Bonus Plan was inaugurated by the company as a guarantee of increase in compensation to hold its employees during the War period. The company does not include the bonus payments as part of the employee's compensation in computing the regular rate of pay for overtime purposes. In this connection, however, it should be remembered that the bonus represents all payments made to the employee during the prior year, which includes all overtime payments. Plaintiff, relying upon Walling v. Harnischfeger Corporation, supra, Walling v.

Youngerman-Reynolds Hardwood Co., Inc., supra, and Walling v. Helmerich & Payne, Inc., supra, and other cases, contends that the Bonus Plan does not comply with Section 7 of the Act.

The testimony conclusively shows that the so-called Bonus Plan payments are in no sense a gratuity. As pointed out above, the plan was devised to hold employees in defendant's services by assuring them an annual increase in pay. Like the Accumulated-Hours Plan, it fails to take into consideration the amount of overtime worked. While overtime worked is included in the total compensation upon which the bonus is calculated, the Plan does not comply with Section 7 of the Act in computing overtime compensation for the employees. It is subject to the same legal obstacles that renders the Accumulated-Hours Plan in violation of the Act and for the same reason the Bonus Plan is in violation of the Act.

### 4. Employees Classified as Executive and Administrative Employees.

Plaintiff's amended petition claims that defendants have failed to comply with the overtime requirements of the Act as to twenty-three employees. However, plaintiff offered no proof of violations as to three of these employees, viz.: J. B. Dupree, Roy E. Butts and A. F. Wilberling. The question of exemption remains for twenty employees. Eighteen of these were employed in the home office and branches of the Jacksonville Paper Company. The other two were employed by Southern Industries. All twenty employees testified either at the trial or by depositions taken at the various branches before the trial. The Supreme Court has held that exemptions to the Fair Labor Standards Act are to be narrowly construed. See A. H. Phillips, Inc., v. Walling, 324 U.S. 490, 65 S.Ct. 807, 157 A.L.R. 876, 89 L.Ed. 1095.

The Administrator is specifically directed, under Section 13(a) (1) of the Act, to define the terms "executive" and "administrative" employees. He has done this, by regulations Title 29, Chapter V, Code of Federal Regulations, Part 541. It is unnecessary for the Court to detail here the "ex-

ecutive" and "administrative" definitions as defined by the Administrator.

The employees in question fall into three groups. The first group of nine employees were employed by the Jacksonville Paper Company as shipping clerks, one in the home office and the other eight in branch offices. The second group of nine employees were employed as cashiers at branch offices of the Jacksonville Paper Company. The remaining two employees were employed as foremen by Southern Industries. The designation of shipping clerks and cashiers may not, in each instant, be in exact accord with the title given the employees, but this classification will suffice for the purpose of considering whether the employees are exempt under said Regulations, Part 541.

The definition of the terms "executive" and "administrative" employees adopted by the Administrator presents considerable trouble in its application in specific cases. This case is illustrative of the trouble encountered by the employer in operating his business under the regulations as well as by the Court in determining whether employees are exempt under the regulations. For example, in this case it is conceded by the Administrator that shipping clerks and cashiers in certain offices of the defendant are exempt, but he contends that in other offices they are not exempt.

The executive exemption requires that an employee satisfy each of six tests in order to be exempt. To come within the administrative exemption it is necessary for an employee to satisfy sub-section A of Section 541.2 and either sub-section B(1), B(2) or B(3). The tests or conditions prescribed by the regulations have been consistently upheld as valid and the Court has no discretion in the matter. Its only duty is to see if the employees meet the prescribed tests.

In some instances the eighteen employees classified as shipping clerks and cashiers failed to qualify because they did not satisfy salary requirements for an administrative employee, laid down by sub-section A of Section 541.2. In other instances they did not customarily and regularly direct the work of two or more employees;

did not have authority to "hire or fire employees" or did not "customarily and regularly exercise discretionary powers." In most instances these employees failed to qualify for the reason that the non-exempt work they performed exceeded the 20% tolerance allowed by the regulation. All eighteen employees failed to satisfy one or more of the foregoing tests. The record is so conclusive upon this question it is unnecessary for the Court to summarize the reason for the disqualification of each particular employee.

As stated above, the outstanding failure to qualify for exemption was the fact that most of these employees performed non-exempt work in excess of the 20% tolerance prescribed by the Administrator. Some day some of the branches are going to grow to an extent, if some of them have not already done so, where these same employees will meet the requirements of Section 541 and become exempt. However, under the evidence introduced in this case the Court is required to and does hold that the eighteen employees classified as shipping clerks and cashiers, did not, at the time the case was heard, meet the requirements of regulation, Part 541, and are subject to the overtime requirements of the Act.

■ There remains the two employees of Southern Industries. C. C. Cantrell, one of these employees, is a working foreman, employed in the envelope department of Southern Industries. His department utilize both machine and handwork. There are about twelve machines in the department. Cantrell supervises from eleven to thirteen employees. About seven of these are women. In addition to this it is Cantrell's duty to keep these machines running. If one breaks down and has to go to the shop he does nothing about the repair. However, adjustments are continuously required and Cantrell holds his job because of his ability to make necessary adjustments and keep the machines in operation. The record indicates he is a good employee and pitches in and helps whenever and wherever he is needed. The Administrator, in adopting his regulations, intended to make an employee of this class subject to the Act. It is clearly so stated in Press

Release G–201. The Court, therefore, has no authority in the matter other than to hold that this employee is subject to the Act.

What the Court has said about Cantrell is equally applicable to E. C. Klehm. Klehm was also employed as a working foreman in the envelope department of Southern Industries. He supervised the work of twelve employees. Eight machines were operated in his department and all employees, except three, were women. Klehm was a die-cutter and warehouse foreman. He regularly performed several types of non-exempt work. In addition to his die-cutting he adjusted machines, kept them operating and generally did everything that had to be done. These extra duties make him also subject to the Act.

### 5. Piece Rate Workers.

■ Southern Industries had two employees doing piece work. The machines operated on a twenty-four hour basis. Each employee worked twelve hours. The man who operated the machines on the day shift was general foreman of the department and was subject to call at night if anything went wrong with the machines which the night man could not adjust, which seldom occurred. Both employees were compensated on a straight piece work basis. The day-man received, in addition to the piece rate for the work he did in the day, additional compensation, on a piece rate basis, for the work done at night by his subordinate. Each of these employees working twelve hours a day did considerable overtime work. This was not taken into consideration in fixing the piece rate. The Supreme Court has held that the overtime provisions of the Act are applicable to piece rate works. See United States v. Rosenwasser, 323 U.S. 360, 65 S. Ct. 295, 89 L.Ed. 301; Overnight Motor Transportation Company v. Missel, supra. Southern Industries, therefore, violated Section 7 of the Act in compensating piece rate workers at straight time piece rate.

### 6. Failure of Employees to Punch the Time Clock.

■ Southern Industries, in order to aid it in complying with the record provisions of the Act, installed a time clock at its plant which it required all employees to punch. In a few instances employees failed to comply with the rule and were not paid. The weakness in the rule is that it is arbitrary to the extent that it penalizes any employee who fails to punch the clock. It should be amended in some fair way so as to give the employee an opportunity to remedy the oversight by having a foreman or some other qualified employee certify as to the hours the employee actually worked. However, the instances of violation shown are trivial and until such time as the Administrator can show more extended violations of this rule the Court refuses to take cognizance of the few isolated violations shown.

### 7. Failure to Keep Records.

The evidence shows and the defendants admit that they have not been keeping a record of the hours worked by the employees classified by them as "executive" and "administrative" employees and have not kept an accurate record of the hours worked by piece workers. Their failure to do so grew out of the fact that defendants believed these employees were not subject to the Act. They agree that should the Court find that the employees in question are subject to the Act, that proper records of the hours worked should be and will be kept. The failure to keep these records constituted a violation of the Act, but compliance by the defendants with the final judgment of this Court on other questions raised in this case will necessitate compliance with the record keeping provisions of the Act.

Plaintiff also complains that the defendants failed to keep proper records of hours worked by certain employees at the Orlando branch and one or two other branches. This complaint grew out of the fact that the local manager of the company at these branches allowed employees time off without loss of compensation and to later make up such loss of time by working short periods of overtime. The evidence shows that this practice was purely for the benefit of the employees, but since the Administrator has complained about it the practice has been discontinued and employees are no

longer permitted to enjoy the privilege of taking time off without loss of compensation and granted the opportunity to work a few minutes overtime to make it up. Since the practice has been discontinued it appears to the Court that no action in this matter is necessary.

### Adjudication in Contempt and Punishment Will Not be Visited Upon the Defendants.

As pointed out earlier in this Memorandum Opinion, all the questions raised by the application of plaintiff, seeking an adjudication in civil contempt based on alleged violations by defendants of the terms of the former judgments of this Court, challenged the legality of practices, save one, that were in effect when the judgments were entered. The one exception is the Bonus Plan, which was inaugurated in 1942, subsequent to the earlier judgment, but prior to the modified judgment of June 3, 1943. All of these questions are of such nature and character that defendants are entitled to their day in court for an adjudication of the questions. In fact, the parties attempted to secure an adjudication of some of these questions at the former trial, but the Court restricted the issues and refused to hear evidence on the questions. Upon this point the Court, in its Conclusions of Law, said:

"The Court announced earlier in the trial of this case that an injunction would issue against the defendants for violations committed prior to the filing of this complaint in all other than the branch houses, and much proffered testimony was rejected by the Court dealing with the business of the defendants at points other than in the branch houses, and the court does not deem it fair and just to make definite or specific findings on particular phases of the practices of the company at those places of business other than at the disputed branches. If it was error then so to hold, it would be more grave error to now otherwise hold, after the rejection of evidence dealing with the particular practices at points other than at the disputed branches."

It does not lie within the discretionary power of the Court to inflict punishment upon defendants for violations of the Act, not specifically imposed by the earlier judgments. To constitute civil contempt there must be some evidence of a wilfull and intentional violation of a Court Order. There is no evidence in this case showing a wilfull violation of any of the specific provisions of the former judgments prohibiting the doing of any specific thing. In fact, as just pointed out above, none of the questions here considered were considered and passed upon by the Court at the former hearing of this case.

Plaintiff insists the Court should enforce compliance with its former judgments by ordering the payment of the unpaid statutory wages due defendant's employees. The Administrator is not authorized by the Act to enforce the payment of unpaid statutory wages to employees who are under the Act. Section 16 of the Act expressly gives such right to the employees. There is no evidence in the record of contumacy that would justify the infliction of a penalty upon the defendants, measured by the amount of unpaid statutory wages. See Walling v. Crane, 5 Cir., 158 F.2d 80.

The Court will consider the application of plaintiff for an adjudication in civil contempt as an amended complaint seeking a broadening of the injunctive orders heretofore entered in this case, and will enter an amended judgment enjoining defendants from violating the provisions of the Fair Labor Standards Act as adjudicated in this Memorandum Opinion.